IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| MARK GODFREY, #848626 | § | |
| VS. | § | CIVIL ACTION NO. 6:09cv61 |
| | | CONSOLIDATED WITH |
| WARDEN SWIFT, ET AL. | § | CIVIL ACTION NO. 6:09cv82 |

MEMORANDUM OPINION AND
ORDER OF DISMISSAL

Plaintiff Mark Godfrey, a prisoner confined at the Coffield Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed the above-styled and numbered civil rights lawsuit pursuant to 42 U.S.C. § 1983. The complaint was transferred to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636(c).

Facts of the Case

The original complaint was filed on February 6, 2009. On June 25, 2009, the Court conducted an evidentiary hearing, in accordance with *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), to consider the Plaintiff's claims. A *Spears* hearing is a proceeding which allows a litigant to offer sworn testimony in support of his allegations. The Fifth Circuit has stated that a *Spears* hearing is appropriate 'to dig beneath the conclusional allegations; to reduce the level of abstraction upon which the claims rest; to ascertain exactly what scenario the prisoner claims occurred, as well as the legal basis for the claim." *Id.* at 180. The hearing is "in the nature of a motion for more definite statement." *Id.* at 180-181. It serves to implement the congressional intent of meaningful access to court for indigent litigants, and also to allow the district court to winnow out the wheat

from the unusual amount of chaff necessarily presented in a system which fosters *pro se* litigation. *Wilson v. Barrientos*, 926 F.2d 480, 482 (5th Cir. 1991) (citing *Watson v. Ault*, 525 F.2d 886, 890 (5th Cir. 1975). Regional Grievance Officer Renee Lanphier, Warden Dewayne Dewberry and Nurse Tara Patton testified under oath about prison polices and information contained in the Plaintiff's prison records.

The Plaintiff noted that he has a history of medical problems. He had open heart surgery when he was three years old. He has had asthma, chronic lung problems and allergies most of his life. Relatively new problems include back pain and prolapsed hemorrhoids. He was transferred to the Coffield Unit from the Allred Unit on or about November 17, 2004. He was assigned to a medical squad due to his health problems. He testified that he is currently 44 years old.

The Plaintiff's problems discussed in the present lawsuit began with an incident that occurred in a dayroom on February 4, 2007. He had a confrontation with members of the Crips gang because he would not be quiet while they were watching television. He was attacked and thrown on top of a steel bench, which resulted in a back injury. The Plaintiff told officials that his life was in danger ("LID"). Lt. Meracle conducted an investigation into his claims. The Plaintiff complained that Lt. Meracle did not arrest the person who assaulted him, who was referred to as "CC." A LID hearing was conducted on February 7, 2007. Warden Swift presided over the hearing. The Plaintiff told him about the attack and his medical problems, but Warden Swift became indignant and asked him why he had not worked for five years. The Plaintiff told him that he held a medical squad status because of his heart condition. Despite the explanation, Warden Swift concluded that the Plaintiff's failure to work for five years was unacceptable. He issued instructions to assign the Plaintiff to a SSI or janitorial job somewhere.

During the LID hearing, Classification Officer McClendon stated that the Plaintiff did not have any medical restrictions for job assignment purposes on the HSM-18 sheet. The Plaintiff stated that it should have shown that he had medical squad status. The Plaintiff alleged that Warden Swift was deliberately indifferent to his health and safety by issuing the instruction to assign him a SSI job. He added that he does not believe that Ms. McClendon was actually looking at his HSM-18 sheet.

The Plaintiff testified that he sued Dr. Orig because he was ultimately responsible for either deleting the medical restrictions or letting them be deleted. He noted that the restrictions may have actually been deleted by Physicians Assistant Nolan. He asserted that he should have been kept on medical squad status, but he was assigned a SSI job due to the deletions of the medical restrictions on his HSM-18.

The Plaintiff testified that he sued Dr. Jane Doe at the University of Texas Medical Branch in Galveston ("UTMB") for another reason. On April 7, 2008, he was sent to John Sealy Hospital for surgery on prolapsed hemorrhoids. He noted that he was experiencing bleeding and drainage. He asserted that the hemorrhoids were bigger than a golf ball. When he told her that the hemorrhoids were not exposed all of the time, she told him that there would be no surgery. The Plaintiff complained that she made the decision without even examining him. When he complained about the lack of an examination, she inspected the hemorrhoids and again stated that there would be no surgery. She noted the limited funds available for medical needs of prisoners.

The Plaintiff testified that he sued Dr. Gore because he also denied him surgery for his hemorrhoids. Dr. Gore examined him by Digital Medical Service T.V. He told the Plaintiff that he would order surgery if a colonoscopy showed that there was bleeding. Dr. Dupont performed the colonoscopy, found bleeding and told the Plaintiff that it appeared that Dr. Gore would perform the

3

surgery. Dr. Gore, however, refused to perform the surgery. Instead, he chose to prescribe stool softeners and a change in diet. The Plaintiff characterized the prescription as a cosmetic change which did not cure the problem. He stressed that the hemorrhoids were continually bleeding and draining, but Dr. Gore would not perform the surgery.

The Plaintiff had a number of complaints about Physicians Assistant Nolan. He complained that Nolan would not suspend his janitorial duties despite his hemorrhoids and associated bleeding. He showed Nolan the blood and secretions on his boxer shorts mixed with feces, but Nolan would not even give him a cell pass to return to his cell to clean up. He noted that the discharge caused rashes on his skin and buttocks area. The Plaintiff noted that he told Nolan in February, 2008, that he would be filing a lawsuit and a complaint with the Texas Medical Board. Other medical personnel subsequently added medical restrictions to his HSM-18, but he believes that Nolan went behind them and deleted the restrictions.

Warden Dewberry testified under oath that a job change could be made during a LID hearing, but ordinarily a job change would be ordered during a Unit Classification Committee hearing. He noted that the Plaintiff signed a waiver in the LID proceeding. The Court notes that the signed waiver, dated February 4, 2007, was included in the classification records submitted during the *Spears* hearing. The Plaintiff stated in the waiver that the situation was resolved and that he no longer wanted protection or a transfer. On February 7, 2007, the Unit Classification Committee concluded that no action would be taken because the Plaintiff voluntarily signed the waiver. Warden Dewberry noted that the HSM-18 in effect at the time had restrictions limiting temperature and humidity extremes. Warden Dewberry testified that the restrictions would have kept him from being assigned to a job in the fields, but it would not have kept him from being assigned to a janitorial job.

4

A HSM-18, dated March 1, 2007, had the same restrictions. These restrictions were deleted in a HSM-18, dated April 2, 2007. Warden Dewberry noted that Dr. Orig signed the change. He noted that the Physical Capability section under PULHES on the HSM-18 showed that the Plaintiff had permanent problems and should not be assigned to a field duty job or a job with prolonged walking. The designation also placed limits on lifting and physical activity. The previous PULHES also had temporary limitations based on problems with the Plaintiff's lower extremities. Warden Dewberry testified that the Physical Capability limitations are still in effect today.

Nurse Patton testified under oath from the Plaintiff's medical records. The records documented the report of open heart surgery at three years of age. The records noted a history of chronic asthma and lung problems. Nonetheless, the records do not show specific chronic restrictions. A medical entry on February 4, 2007, noted abrasions to the Plaintiff's neck and back. The Plaintiff also complained about back pain. The abrasions were cleaned. The Plaintiff came back to the infirmary on February 11, 2007. He complained about back pain. Nurse Patton testified that a medical provider places medical restrictions in a prisoner's file and they prepare the HSM-18s. They do not make job assignments. The Plaintiff noted, however, that medical personnel understand the implications of the restrictions placed on the HSM-18. Nurse Patton testified that the medical records document a chronic history of hemorrhoids. On April 7, 2008, a digital rectal exam was performed and a conclusion was entered to employ a conservative approach using stool softeners and fiber. Nurse Patton testified that a conservative approach is consistent with the type of care provided by free-world doctors. She added that there are trade-offs in performing surgery versus a conservative approach. She was aware of some hemorrhoid surgeries involving inmates, but such surgeries were rare.

The Plaintiff testified that he told Nolan about his heart surgery. Nolan ran an EKG. Nolan stated that the EKG showed that he had heart problems. Nolan also told him that many of the records compiled at the Allred Unit were not on his computer since the Allred Unit was part of a different medical system. Nolan gave him a four hour work restriction due to heart problems but no restrictions based on hemorrhoids. The Plaintiff noted that he had three holes in his heart. He still has problems, particularly with heat. He can work okay until he gets overheated. He noted that mopping on stairs can make him overheated.

The Plaintiff gave the Court permission to review his medical records. The medical records are somewhat extensive. There are a number of reports from x-rays. An x-ray, dated February 19, 2007, showed a normal thoracic spine and lumbrosacral spine. An x-ray of his heart was made on April 13, 2007. Sternal wire sutures were noted, but the heart size was described as normal and there were no active diseases noted. Another x-ray of the lumbar spine, dated January 18, 2008, noted mild scoliosis but otherwise normal. The x-ray noted several broken sutures in the lower sternal region.

The records show that the Plaintiff has routinely been prescribed albuterol, hemorrhoidal ointment, hydrocortisone cream and docusate calcium. Physicians Assistant Nolan was routinely listed as the prescriber. Dr. Tito also prescribed psyllium fiber.

The clinic notes reveal that Dr. Orig performed a physical exam on December 20, 2006. He noted the Plaintiff's history of heart surgery at three years old. With respect to PULHES, Dr. Orig gave the Plaintiff a "3MP" for Physical. On February 28, 2007, he added "3CT" for lower extremities. The restrictions for lower extremities were removed on March 31, 2007. A four hour work restriction was added by Physicians Assistant Nolan on April 6, 2007. Nolan added a no lifting

over 30 pounds restriction on February 28, 2008. The four hour work and lifting restrictions were deleted by Nolan on June 2, 2008. Physicians Assistant Muldowney added limited standing, no lifting over 25 pounds and no repetitive squatting restrictions on August 7, 2008. Nolan deleted the restrictions on October 20, 2008. Nurse Practitioner Lu added them back on November 12, 2008. Nolan deleted them again on February 12, 2009. It was noted that the Plaintiff was assigned to a medical squad at the time. On February 18, 2009, Dr. Orig had the three restrictions added again and further added "3EP" for lower extremities.

The clinic notes reveal that the Plaintiff was seen by Nurse Dekinder after the incident with the Crips on February 4, 2007. She noted that the Plaintiff complained that he had been grabbed by the throat and thrown on a dayroom bench. She observed a slight abrasion to the left ear, redness to the left side of the neck and an abrasion to the lower back which was brilliant red with a slight amount of blood. She cleaned the abrasions. In response to a sick call request on February 9, 2007, cold packs and warm moist heat were prescribed, along with acetaminophen. On February 11, 2007, he was referred to a provider for a possible x-ray. On February 28, 2007, a "L3CT" designation was issued for thirty days due to lumbar strain.

On March 11, 2007, Lt. Hatt called the clinic after observing the Plaintiff lifting weights in the recreation yard, as opposed to being at work. Nurse Seliga told him that the Plaintiff was given a seven day cell pass on February 28, 2007, along with a lower bunk restriction. On the same day, Dr. Orig issued instructions for a cell pass for seven days and lower extremities restrictions for thirty days.

The Plaintiff complained about hemorrhoids on June 28, 2007. Nurse Dekinder noted a nodule approximately 3 cm. in circumference near the anal canal. She was told that it had been there

7

for about three and one-half weeks. She referred him to a provider. Dr. Kuykendall conducted a video consultation on October 2, 2007. He noted that the Plaintiff indicated that he had a long history of internal hemorrhoids with episodes of pain, prolapse and bleeding. The Plaintiff told him that there was no relief from repeated regimens of stool softeners. External hemorrhoid tags were visible, but no prolapsed internal hemorrhoids were visible on that day. The analysis was internal hemorrhoids with pain, prolapse and bleeding. The Plaintiff was referred UTMB.

On November 29, 2007, the Plaintiff submitted a sick call request concerning his work restrictions. He stated that he had a history of heart problems and that he had hemorrhoids and that he could not do the work that was being expected of him. He wanted a cell pass to keep him from working. Nurse Cote noted that he had an appointment with a provider and that a new cell pass was denied because he presently had a cell pass. On December 7, 2007, Physicians Assistant Nolan prepared a clinic note. He recorded that the Plaintiff complained about hemorrhoids and that they popped out and were bleeding. It was noted that Dr. Kuykendall had already seen him and that the Plaintiff was ready for surgery. Nolan prescribed a hemorrhoid pad for six months, Anusol and restriction III numbers 4 and 9. He sent an urgent request to UTMB for echocardiology. He noted no enlargement on x-rays, but he asked for the test to assess appropriate cardiac limitations. On December 12, 2007, the expedited HG Cardio was denied, and the Plaintiff was scheduled for an appointment with the cardiologist for August 19, 2008.

On April 5, 2008, a UTMB entry noted that the Plaintiff complained about hemorrhoids and bleeding upon defecation. A doctor observed no obvious hemorrhoids and expressed the opinion that hemorrhoids were likely internal. Fiber was ordered. On May 19, 2008, an entry from Hospital Galveston noted that the Plaintiff needed a colonoscopy. It was further noted that he should be

scheduled for general surgery when a date was available. On June 10, 2008, Physicians Assistant Nolan issued instructions to let restrictions III numbers 4 and 9 expire. A colonoscopy was conducted on June 26, 2008, with Dr. Dupont the attending physician. It was noted that the colonoscopy was being performed due to hemorrhoids and recurrent rectal bleeding. A polyp was found in the ascending colon. The polyp was snared, cauterized and sent to pathology. It was benign. Internal hemorrhoids were observed, but nothing remarkable was otherwise noticed. Dr. Dupont recommended a high fiber diet and TDCJ telemed in three months for possible surgery for a hemorrhoidectomy. The results of the colonoscopy were sent to Dr. Orig by UTMB on July 7, 2008. A recommendation was made for stool softeners and a high fiber diet. With respect to work restrictions, it was recommended that the Plaintiff's restrictions include no heavy lifting and no prolonged standing.

On October 17, 2008, the Plaintiff complained about pain and discomfort from hemorrhoids. He stated that they were bleeding more and were bigger. He stated that he needed to see a doctor and needed surgery. He was given the routine protocol for hemorrhoids, including diet restrictions, instructions to take Bismuth and to resubmit a sick call request if the symptoms did not resolve in 48 hours. On November 14, 2008, Nurse Practitioner Elias noted that surgery was deferred. In the mean time, the Plaintiff was to have medical restrictions consisting of limited standing, no lifting over 5 pounds and no repetitive squatting. It was noted that the restrictions should be removed after the surgery. On February 12, 2009, Nolan issued instructions to let the restrictions expire.

On February 14, 2009, the Plaintiff submitted a sick call request asserting that he was told that he would never be assigned to work in the field because he had hemorrhoids, chronic lung problems, open heart surgery and fistulas. He noted that he was assigned to work with field 16

9

squad. He stated that he needed his medical squad 3 status back immediately. It is again noted that Dr. Orig responded by adding the three work restrictions and "3EP" designation for lower extremities on February 18, 2008.

## Discussion and Analysis

The first issue that should be addressed concerns the attack by the Crips on February 4, 2007, and the subsequent investigation conducted by Lt. Meracle. The Eighth Amendment affords prisoners protection against injury at the hands of other inmates. *Smith v. Wade*, 461 U.S. 30 (1983); *Johnston v. Lucas*, 786 F.2d 1254, 1259 (5th Cir. 1986). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Instead, the standard to employ is whether prison officials were "deliberately indifferent" to the safety needs of an inmate. *Id.*; *Cantu v. Jones*, 293 F.3d 839, 844 (5th Cir. 2002). "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

In the present case, the Plaintiff has not shown that anyone knew of and disregarded an excessive risk to his health and safety before the attack on February 4, 2007. He has not shown that anyone was deliberately indifferent to his safety. He complained about Lt. Meracle's failure to arrest the person who attacked him, but the Plaintiff signed a waiver. It is also noted that a prisoner does not have a constitutional right to have charges filed against someone. *See, e.g., Oliver v. Collins*, 904 F.2d 278, 281 (5th Cir. 1990); *Robinson v. U.S., Federal Bureau of Investigation*, 185 Fed.

Appx. 347 (5th Cir. 2006). The Plaintiff's claims involving the attack fail to state a claim upon which relief may be granted and are frivolous in that they lack any basis in law and fact. Such claims should be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

The remainder of the Plaintiff's claims concern his medical condition. He complained that Warden Swift issued instructions to have him assigned to a SSI or janitorial job somewhere. It is again noted that deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105-07 (1976); *Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989). If prison officials knowingly assign an inmate to a job they know may significantly aggravate a serious physical ailment, then such a decision would constitute deliberate indifference to serious medical needs. *Jackson v. Cain*, 864 F.2d at 1246. At the time of the LID hearing on February 7, 2007, the Plaintiff's medical restrictions were no temperature or humidity extremes. Warden Dewberry testified that the restrictions would have kept him from being assigned to the fields, but they would not kept him from being assigned a SSI or janitorial job. Warden Swift's instructions to give the Plaintiff a SSI or janitorial job do not give rise to an inference that he was deliberately indifferent to the Plaintiff's serious medical needs because the instructions were consistent with his HSM-18 in effect at the time. *See Patton v. Swift*, 46 Fed. Appx. 225 (5th Cir. 2002) (Warden Swift was not deliberately indifferent for assigning an inmate to a job that was consistent with medical restrictions issued by medical personnel). The claim against Warden Swift fails to state a claim upon which relief may be granted and is frivolous in that it lacks any basis in law and fact. The claim should be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

The remaining defendants are medical personnel. Once again, the deliberate indifference standard applies. In *Farmer v. Brennan*, the Supreme Court noted that deliberate indifference involves more than just mere negligence. 511 U.S. at 835. Instead "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. *See also Reeves v. Collins*, 27 F.3d 174, 175 (5th Cir. 1994).

In *Domino v. Texas Department of Criminal Justice*, the Fifth Circuit discussed the high standard involved in showing deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

239 F.3d 752, 756 (5th Cir. 2001). Dissatisfaction with medical treatment or a diagnosis does not constitute "deliberate indifference" to a serious medical need and does not rise to the level of the denial of a constitutional right. *Estelle v. Gamble*, 429 U.S. at 106; *Johnson v. Treen*, 759 F.2d at 1238. A disagreement with medical personnel concerning the treatment provided for hemorrhoids does not provide a basis for a deliberate indifference claim. *Miller v. Kalmanov*, 252 Fed. Appx. 680, 681 (5th Cir. 2007). A claim that a doctor prescribed the wrong medication for hemorrhoids, at most, stated a claim for negligence, malpractice, or disagreement with treatment, which will not

12

support a finding of deliberate indifference under the Eighth Amendment. *Nunley v. Mills*, 217 Fed. Appx. 322, 324 (5th Cir. 2007). Complaints about work-related restrictions issued by a medical personnel do not provide a basis for a civil rights lawsuit when the restrictions were carefully monitored and consistent with other medical recommendations. *Brown v. Adams*, 267 Fed. Appx. 377, 378-79 (5th Cir. 2008).

In the present case, the medical records reveal that the Plaintiff received extensive medical care in response to his complaints in conjunction with his heart surgery, lung problems, asthma and hemorrhoids. Medical restrictions were routinely added to his HSM-18 because of his problems. The Plaintiff does not have a basis for a deliberate indifference claim because he was not given all of the restrictions that he wanted. Most recently, when the Plaintiff submitted a sick call request complaining that his restrictions were deleted on February 12, 2009, Dr. Orig added the restrictions back on his HSM-18, along with a "3EP" designation on PUHLES, on February 18, 2009. The records do not support an inference of deliberate indifference regarding the medical restrictions.

The medical care provided to the Plaintiff regarding his hemorrhoids likewise does not give an inference of deliberate indifference. Medical personnel were responsive to his complaints. Tests were ordered in response to his complaints, and such tests were ordered even when a medical provider did not see any signs of hemorrhoids. He was given a colonoscopy due to his complaints, and a polyp was removed. The medical providers issued prescriptions for stool softeners and a high fiber diet. Medical restrictions were issued. The Plaintiff does not have a basis for a potentially meritorious deliberate indifference claim because medical providers opted for a conservative approach over surgery. The Court notes that Nurse Practitioner Elias specified on November 14, 2008, that surgery was deferred. The Court is aware that many medical procedures that had been

scheduled to be performed at UTMB were deferred after Hurricane Ike struck Galveston. The medical records make it appear that surgery is still a possibility, but a conservative approach is being followed at this time. The Plaintiff does not have a basis for a deliberate indifference claim because he disagrees with the medical decisions and care provided by medical personnel. The Plaintiff's claims against the medical providers fail to state a claim upon which relief may be granted and are frivolous in that they lack any basis in law and fact. Such claims should be dismissed pursuant to 28 U.S.C. § 1915A(b)(1). It is therefore

**ORDERED** that complaint is dismissed with prejudice pursuant to 28 U.S.C. § 1915A(b)(1). It is further

**ORDERED** that all motions not previously ruled on are **DENIED**.

So **ORDERED** and **SIGNED** this **9** day of **July, 2009.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE